**NBA PROPERTIES, INC.,**
**Plaintiff, Appellee,**

v.

**Richard GOLD, et al.,**
**Defendants, Appellants.**

**No. 89–1572.**

United States Court of Appeals,
First Circuit.

Heard Nov. 8, 1989.
Decided Feb. 1, 1990.

Robert L. Ellman, with whom Chesley Oriel, Alfred E. Pearson, and Finkelstein and Oriel, Framingham, Mass., were on brief, for defendants, appellants.

Jeffrey L. Laytin, with whom Richard B. Verner, Lewin & Laytin, P.C., New York City, Harold W. Potter, Jr., and Sherburne, Powers & Needham, Boston, Mass., were on brief, for plaintiff, appellee.

Before BOWNES, Circuit Judge, VAN GRAAFEILAND,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

NBA Properties, Inc. ("NBA"), which controls the legal rights to certain National Basketball Association trademarks and tradenames, found that several franchised "Wild Tops" retail stores were selling clothes and heat transfers bearing those marks and names without NBA permission. NBA sued two companies, one called National Development Group, Inc., and the other Wild Tops Franchising, Inc., along with their principal owner, Richard Gold (collectively, the "Franchisors"). The Franchisors settled the case. In doing so, the Franchisors agreed that the federal district court would enter a "Final Judgment and Permanent Injunction" (the "Decree") forbidding them to engage in this unlawful activity. Such a decree was entered. The Franchisors also signed a contract called a "Settlement Agreement," in which, among other things, they promised to police their franchisees to prevent a repetition of the problem.

About a year or so later NBA found that several Wild Tops franchised retailers were again selling, without permission, clothes with NBA marks and names. NBA went back to court, seeking to hold the Franchisors in contempt of the court's Decree. The court found the Franchisors in contempt of the Decree. The Franchisors now appeal this finding to us.

* Of the Second Circuit, sitting by designation.

The Franchisors are willing to assume, purely for the sake of argument, that they have violated the "Settlement Agreement." Even so, they say, they have not violated the Decree. They argue that the language of the Decree (unlike that of the Settlement Agreement, which has not been incorporated into any court order) does not impose an affirmative duty upon them to police their franchisees, and that they themselves did not engage in any of the conduct the Decree forbids. For this reason, they contend, the court could not lawfully hold them in contempt of the Decree itself.

■ We must decide the issue in this case in light of unbroken lines of authority that caution us to read court decrees to mean rather precisely what they say. Decrees must "be specific;" they must "describe in reasonable detail" just what "acts" they forbid. Fed.R.Civ.P. 65(d). These specificity requirements are not "mere[ly] technical" but are "designed to prevent uncertainty and confusion ... and to avoid" basing a "contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974) (per curiam); *see Diapulse Corp. of America v. Carba, Ltd.*, 626 F.2d 1108, 1111 (2d Cir. 1980). Also, we must read any "ambiguities" or "omissions" in such a court order as "redound[ing] to the benefit of the person charged with contempt." *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir.1971) (per curiam); *see In re Baldwin–United Corp.*, 770 F.2d 328, 339 (2d Cir.1985); *New York Telephone Co. v. Communications Workers of America*, 445 F.2d 39, 48 (2d Cir.1971); 11 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2955, at 538 (1973 & Supp.1989). Finally, we must keep in mind that the franchis*ees* are not the defendants in this case; and, as Learned Hand pointed out, an injunction does not forbid "the act described ..., but only that act *when the defendant does it.*" *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir.1930). After reviewing the record and applying these standards, we conclude that the district court could not lawfully hold the Franchisors in contempt of the Decree.

■ The evidence introduced at the contempt hearing simply showed that Wild Tops stores in Nanuet and Kingston, New York, near Riverside, California, and in Manchester, New Hampshire, had made unauthorized sales of NBA-marked clothes. It also showed that the Franchisors did not own these stores; relatives of Richard Gold owned some of them, and others are "franchisees," which is to say that they are independent retailers who have signed a franchise contract with the Franchisors. Given this latter fact, we can find no provision in the Decree itself that imposes an obligation that the Franchisors violated.

The Decree, insofar as relevant, says that the Franchisors, "their agents, servants, employees, confederates, attorneys and any persons acting in concert or participation with them," may not engage in

(c) Passing off, inducing, or enabling others to sell or pass off any heat transfers, garments and/or other items which are not genuine NBA products as and for genuine NBA products;

. . . .

(h) Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs . . . .

The Franchisors did not violate these specific obligations. The record contains no evidence that the *Franchisors* (the two companies and Richard Gold) passed off, induced, or enabled others to sell or pass off unauthorized, NBA-marked clothes as if they were genuine; nor does it show they helped their franchisees do so. Rather, the Franchisors wrote to each of the franchisees telling them that sale of NBA-marked items was unlawful, and that any such future sale would amount to a violation of the franchise agreement and could lead to termination of the franchise contract. They also sent copies of the Decree and the Settlement Agreement to all franchisees. Aside from this conduct (which helps the Franchisors), the record says nothing about the Franchisors' own activity. To find conduct that amounts to the

forbidden "enabling" would amount to reading the Decree, phrased in terms of negative prohibitions, as if it imposed an affirmative obligation upon the Franchisors to police their franchisees. To do so would turn a "prohibitory" injunction into a "mandatory" injunction, *cf. Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 441 (2d Cir.1977); 11 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2942, at 377 (1973 & Supp.1989) (noting that courts may be more reluctant to grant mandatory injunctions than prohibitory ones), and, as we have previously said, we can find no legal basis for reading the Decree's language so broadly.

We recognize that the Franchisors took one positive act that, in a sense, "enable[d]" the franchisees to sell the forbidden items; they granted the franchisees the franchise itself. That grant helped the franchisees sell the forbidden articles, for it permitted them to use the name "Wild Tops" in connection with their stores. Since a franchisee, by definition, however, is one who possesses such a grant, to read "enabling" to encompass the simple granting of the franchise itself is to read the Decree as imposing strict liability upon the Franchisors for the acts of their franchisees. To find such liability in language that does not state it would require stretching the language, and reading it rather strongly against, rather than "to the benefit of[,] the person charged with contempt." *Kammerer*, 450 F.2d at 280. *Cf. Gonzalez v. Walgreens Co.*, 878 F.2d 560, 561–62 (1st Cir.1989) (holding that franchisee's mere use of the name "Walgreens" was not enough to create genuine issue of material fact whether franchisor was liable under apparent agency theory for franchisee's alleged negligence).

We also recognize that the record contains considerable evidence showing that certain of the *franchisees* engaged in the conduct that the Decree forbids, and the Decree prohibits "any persons acting in concert or participation with" the Franchisors from using NBA marks without permission. This language, however, does not help NBA impose contempt liability upon the Franchisors. It applies to the *franchisees*, not the *Franchisors*. It forbids those acting in "concert" *with* the *defendants* from engaging in the prohibited acts; it does not in its own terms prohibit the *defendants* from acting in "concert" *with someone else*. (There is likely no need to use this language to prevent the latter, given the broad prohibition that arises out of the "assisting, aiding, or abetting" language found in subparagraph (h) of the injunction, *see* p. 32, *supra*.) Nor can one somehow use this language to bootstrap a franchisee violation into a violation by the Franchisors. The courts have interpreted the language in question ("active concert or participation with") as requiring that a person either be "legally identified with" a party in the case or "aid and abet" the party to violate a decree. *See, e.g., G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 35 (1st Cir. 1980); *United Pharmacal Corp. v. United States*, 306 F.2d 515, 517 (1st Cir.1962); *Alemite*, 42 F.2d at 833. The franchisees in this case are not "legally identified with" the Franchisors; they are legally separate persons. Nor did they "aid and abet" the Franchisors. to violate the Decree, for, as we have pointed out, the Franchisors took no positive action "aiding or abetting" the franchisees; hence the Franchisors did not violate the Decree.

■ Finally, we recognize that defendants may have violated the promises contained in the contract called "Settlement Agreement." The Settlement Agreement—the *contract*—contains language that tells the Franchisors to prevent unauthorized sales at these stores. It says that the Franchisors promise they

will undertake the responsibility of insuring that none of [their] franchisees sell any heat transfers, garments or other articles bearing any unlicensed simulation, reproduction or colorable imitation of the NBA Trademarks. It shall be deemed a material breach of this agreement and the defendant[s] shall be liable for all expenses, investigative fees, attorneys fees, damages and all other available remedies in the event that defendant[s] fail[ ], within thirty (30) days of

request of written notification thereof by certified and/or registered mail, to take all reasonable steps to insure that none of [their] franchisees are selling any heat transfers, garments or other articles bearing any unlicensed simulation, reproduction, or colorable imitation of the NBA Trademarks....

But the Decree does not incorporate the contract or this language. It simply does not refer to it. We do not see how, in light of the authority we have cited above, *see* p. 32, *supra,* we could read this language into a court decree that does not refer to it. After all, the consequences of violating contract and decree are significantly different. To violate a promise in a private contract that settles a suit subjects a party to civil liability only, and only after an opportunity to challenge the contract's validity. *See, e.g., Mathewson Corp. v. Allied Marine Industries,* 827 F.2d 850, 853–57 (1st Cir.1987) (upholding enforcement of a settlement agreement after considering issues of timeliness of acceptance and lack of consideration). The nonbreaching party may be able to obtain an order enforcing the private agreement, *see United States v. Baus,* 834 F.2d 1114, 1127 (1st Cir.1987); *Mathewson Corp.,* 827 F.2d at 852; *Dankese v. Defense Logistics Agency,* 693 F.2d 13, 16 (1st Cir.1982); but without such an order, a court cannot hold the breaching party in contempt, *see Joy Mfg. Co. v. National Mine Service Co.,* 810 F.2d 1127, 1128 n. 3 (Fed.Cir.1987); *Gardiner v. A.H. Robins Co.,* 747 F.2d 1180, 1190 n. 13 (8th Cir.1984). To violate a federal court decree, however, exposes a party not only to liability for civil contempt, but to criminal contempt liability that a court may ordinarily impose without providing the party an opportunity to challenge the validity of the decree itself. *See, e.g., United States v. United Mine Workers,* 330 U.S. 258, 292–93, 67 S.Ct. 677, 695–96, 91 L.Ed. 884 (1947) (criminal sanctions appropriate for violation of injunction); *G. & C. Merriam Co.,* 639 F.2d at 40 (same); *Walker v. City of Birmingham,* 388 U.S. 307, 314–15, 87 S.Ct. 1824, 1828–29, 18 L.Ed.2d 1210 (1967) (defendant cannot normally defend against a criminal contempt action by challenging the validity of the underlying injunction); *In re Providence Journal Co.,* 820 F.2d 1342, 1346 (1st Cir.1986) (same), *modified on rehearing en banc,* 820 F.2d 1354, *cert. dismissed sub nom. United States v. Providence Journal Co.,* 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988). Because of the greater significance and the more serious consequences that the law attaches to violation of a court decree, it imposes requirements that the decree be specific, and it refuses to read ambiguities against a defendant. *See* cases cited p. 32, *supra.* For similar reasons, *see* p. 33, *supra,* we cannot read the Decree as incorporating a contract to which it makes no reference.

For these reasons, the judgment of the district court is

*Reversed.*